GREGORY K. WILKINSON, Bar No. 054809
STEVE M. ANDERSON, Bar No. 186700
JILL N. WILLIS, Bar No. 200121
KIRA L. JOHNSON, Bar No. 259382
BEST BEST & KRIEGER LLP
3750 University Avenue, Suite 400
P. O. Box 1028
Riverside, CA  92502
Telephone:  (951) 686-1450
Facsimile:  (951) 686-3083
Gregory.Wilkinson@BBKlaw.com

Attorneys for Plaintiff
STATE WATER CONTRACTORS

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE WATER CONTRACTORS, | Case No. |
| Plaintiff, | Judge:  Hon. Oliver W. Wanger |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| GARY LOCKE, Secretary of the United States Department of Commerce; UNITED STATES DEPARTMENT OF COMMERCE; JAMES W. BALSIGER, Acting Assistant Administrator, National Oceanic and Atmospheric Administration, National Marine Fisheries Service; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION'S NATIONAL MARINE FISHERIES SERVICE; and DOES 1 through 5, inclusive, | [Filed concurrently with:<br><br>1.  Request for Judicial Notice; and<br><br>2.  Notice of Related Cases] |
| Defendants. | |
| LESTER SNOW, Director, California Department of Water Resources; CALIFORNIA DEPARTMENT OF WATER RESOURCES; MICHAEL L. CONNOR, Commissioner, United States Bureau of Reclamation; DONALD R. GLASER, Director, Mid-Pacific Region, United States Bureau of Reclamation; UNITED STATES BUREAU OF RECLAMATION, | |
| Real Parties in Interest. | |

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

Plaintiff State Water Contractors ("Plaintiff" or "State Contractors") alleges as follows:

**INTRODUCTORY INFORMATION**

1.     Plaintiff is a non-profit association of 27 public agencies from Northern, Central and Southern California that purchase water under contract from the California State Water Project.  Collectively, the members of the State Contractors deliver water to more than 25 million residents throughout the state and more than 750,000 acres of highly productive agricultural lands.

2.     As public agencies, the State Contractors' members have an obligation and mandate to provide reliable and safe drinking water, protect the environment and public health, and promote water conservation and greater water use efficiency.  Each and every day families, businesses and farms throughout California depend on water delivered by the State Contractors' members.

3.     The San Francisco-San Joaquin Bay Delta ("Delta") is the largest estuary on the west coast of the United States.  It is an integral part of California's water delivery system – serving as a conduit for water that serves millions of persons throughout Northern, Central and Southern California – and also serves, *inter alia*, as a migratory corridor for multiple species of anadromous fish.  In addition to supporting an important ecosystem, water from the Delta is indispensable to the agricultural industry and businesses that drive our State's economy, as well as to approximately two-thirds of the State's human population.

4.     During the past two years, public water agencies that rely on California State Water Project ("SWP") supplies have faced significant and unprecedented water supply cutbacks. This year alone, approximately 430,000 acre-feet of water – enough to serve more than two million people for one year – has been cut to satisfy the requirements of the United States Fish and Wildlife Service Delta smelt biological opinion.

5.     At issue in this action is the approval by the National Marine Fisheries Service ("NMFS") of a Biological Opinion ("BiOp") regarding the effect of the Operations Criteria and Plan ("OCAP") developed for the SWP and the federal Central Valley Project ("CVP")

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

(collectively, the "Project") on salmonid species, including the Sacramento River winter-run Chinook salmon ("winter-run Chinook"), the Central Valley spring-run Chinook salmon ("spring-run Chinook"), the Central Valley steelhead ("CV steelhead") and the Central California Coast steelhead ("CCC steelhead"), the Southern Distinct Population Segment of North American green sturgeon and the Southern Resident killer whale, all of which are listed under the federal Endangered Species Act ("ESA") (16 U.S.C. § 1531 et seq.), and designated or proposed critical habitat for the salmonid species and green sturgeon.

6.     NMFS issued a biological opinion for virtually the same project in 2004 that was challenged in *Pacific Coast Federation of Fishermen's Associations v. Gutierrez* (*Gutierrez*), E.D. Cal. Case No. 1:06-CV-00245-OWW-GSA.  Pursuant to Orders issued in that case, NMFS was directed to develop a new biological opinion.  The new BiOp was issued on June 4, 2009 and concludes, among other things, that operation of the Project will "jeopardize" the species at issue unless significant additional restrictions on water exports are imposed.

7.     NMFS has estimated that the new BiOp calls for a reduction in exports of an average of 330,000 acre-feet per year over and above reductions associated with the Delta smelt biological opinion.  In a time of severe statewide drought and depleted reservoirs that has risen to the level of a formally declared State of Emergency, these restrictions are crippling to the members of the State Contractors and the people and businesses they serve.  Such actions are likely to result in severe and irreparable water supply and environmental impacts to Plaintiff and its member agencies that threaten the public health and safety of the millions of Californians who rely on SWP supplies.

8.     The BiOp contains significant legal and scientific inadequacies that render NMFS' adoption of the BiOp arbitrary and capricious.  Among other deficiencies, the BiOp fails to comply with the ESA requirement to use the best available scientific data, *inter alia*, because it disregards relevant data and cherry-picks other data to reach a jeopardy conclusion; violates the ESA's requirement that the reasonable and prudent alternative that is adopted satisfy very specific criteria adopted by NMFS in Joint Regulations intended to implement the ESA; includes no environmental review in violation of the National Environmental Policy Act ("NEPA") (42

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

U.S.C. § 4321 et. seq.); fails to quantify or address the effects of the proposed SWP and CVP operations in the manner required by the ESA; utilizes an improper standard for determining "jeopardy"; and fails to support, with the best available scientific data, its finding of jeopardy to the species or explain why its reasonable and prudent alternative will prevent jeopardy. In addition to the foregoing deficiencies, NMFS failed to analyze and account for the fact that changing ocean conditions, combined with ocean harvest, has already been identified by NMFS itself, as the primary cause of the recent salmon decline. Further, in its BiOp, NMFS largely ignored or failed to account for the effects of other stressors that harm the species at issue, including invasive plants and aquatic animals, toxic runoff, thousands of unscreened in-Delta diversions, and the presence of non-native species to the Delta.

9.     The State Contractors' member agencies have already been forced to endure numerous water supply cutbacks in a failed attempt to boost fish populations. The RPA proposed in the BiOp is not scientifically sound, is speculative, and has not been shown, using the best available science, to be an alternative that will accomplish the goals of the ESA. There is simply no conclusive scientific evidence that further water delivery cutbacks from the Delta will benefit the fish species NMFS is attempting to protect.

10.     The State Contractors support an effective, long-term plan for the Delta and, in fact, are actively working to develop such a plan known as the Bay Delta Conservation Plan, or "BDCP." By the same token, however, the State Contractors cannot support legally and technically inadequate measures by NMFS that fail to satisfy even the most basic elements of the ESA and ignore the requirements of NEPA. The SWP water supply put at risk by the NMFS BiOp is critical to the millions of people throughout California who rely on stable, long-term water deliveries for their health, safety and welfare.

11.     Given the numerous scientific and legal inadequacies contained in the BiOp, and the critical need to secure a reliable, long-term water supply, the State Contractors have filed this complaint seeking injunctive and declaratory relief to, *inter alia*, invalidate the BiOp without vacatur in order to compel NMFS and the other Defendants named herein to comply with applicable provisions of law.

BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

## JURISDICTION AND VENUE

12.     Jurisdiction of this action is properly vested with this Court pursuant to 28 U.S.C. section 1331 in that the claims stated herein arise under the laws of the United States, including the ESA, the Administrative Procedure Act ("APA") (5 U.S.C. § 551 et seq.), and NEPA.  This Court is also vested with jurisdiction pursuant to 28 U.S.C. section 2201 (declaratory relief) and 5 U.S.C. section 701 et seq. (federal agency action).

13.     Venue in this judicial district is proper pursuant to 28 U.S.C. section 1391(e)(2) and Rule 3-120 of the Local Rules of the United States District Court for the Eastern District of California.  Plaintiff's headquarters is located within the Eastern District.  Moreover, the effects of Defendants' actions will be felt by Plaintiff and its member agencies in this division of the Eastern District.  The member agencies of the State Contractors include 27 public districts and agencies which provide water in numerous counties, including to users in Kings and Kern Counties.  Furthermore, reductions in exports from the Delta will place greater demands upon alternative sources of water, including groundwater, that are used to meet reasonable and beneficial water demands within Merced, Fresno, Kings and Kern Counties.  The adverse environmental effects of the reductions in water supply caused by the improper actions challenged herein will be felt in Kings and Kern Counties, among numerous other locations.

## PARTIES

14.     Plaintiff State Contractors is, and at all times mentioned herein was, a non-profit mutual benefit corporation organized and existing under the laws of the State of California to represent the common interests of 27 public water supply agencies located in California's Central Valley, in the San Francisco Bay area, along California's Central Coast, and in Southern California.  Each of the members of the State Contractors holds a valid contract with the State of California to receive water from the SWP, and together they deliver that water to more than 750,000 acres of agricultural lands and 25 million people who live and work within their service areas.

15.     Defendant Department of Commerce ("DOC") is a department of the United States Government, established by statute and charged with, *inter alia*, the responsibility for

- 4 -

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

administering and implementing the ESA.

16.    Defendant Gary Locke is the Secretary of the Department of the Commerce ("Commerce Secretary").  The Commerce Secretary is responsible, under the ESA, for consulting with federal agencies regarding any action authorized, funded, or carried out by such "action agency" that may effect (or could jeopardize) the continued existence of any threatened or endangered species or result in the destruction or adverse modification of critical habitat of any threatened or endangered species under the jurisdiction of the DOC.

17.    Defendant National Marine Fisheries Service is a federal agency and a division of the National Oceanic and Atmospheric Administration ("NOAA") and the DOC to which the DOC has delegated its responsibility for administration of the ESA.

18.    Defendant Dr. James W. Balsiger is Acting Assistant Administrator for NMFS and is, consequently, responsible for administering the ESA.

19.    Real Party in Interest California Department of Water Resources ("DWR") is an agency of the State of California created pursuant to California Water Code section 120 et seq. and is charged with various duties and responsibilities, including operation of the SWP and entering into and administering contracts for SWP water on behalf of the State of California.

20.    Real Party in Interest Lester Snow is the Director of DWR and is, consequently, responsible for operation and administration of the SWP.

21.    Real Party in Interest United States Bureau of Reclamation (the "Bureau") is an agency of the United States, within the Department of the Interior, and is charged with various duties and responsibilities, including operation of the CVP and entering into and administering contracts for CVP on behalf of the United States of America.

22.    Real Party in Interest Michael L. Connor is the Commissioner of the Bureau and is, consequently, responsible for operation and administration of the CVP.

23.    Real Party in Interest Donald R. Glaser is the Director of the Mid-Pacific Region of the Bureau and is, consequently, responsible for operation and administration of the CVP.

24.    Plaintiff does not know the true names and capacities of Defendants designated as Does 1 through 5, inclusive.  Plaintiff is informed and believes and thereupon alleges that each of

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

1  the Defendants sued as Does 1 through 5, inclusive, has, or claims to have, an interest in the

2  subject matter of this litigation.

3  ### FACTUAL BACKGROUND

4  ### OPERATIONS OF THE STATE WATER PROJECT

5    25. The State Water Project is owned by the State of California and is operated by

6  Real Party in Interest DWR.  The SWP is the largest state-operated water supply project in the

7  United States and includes, *inter alia*, 34 storage facilities, reservoirs and lakes; 20 pumping

8  plants; 4 pumping-generating plants; 5 hydroelectric power plants; and about 700 miles of

9  pipelines and open canals that collectively stretch from Oroville Reservoir, located on the Feather

10  River in the north, to Perris Reservoir, located in Riverside County in the south. Twenty-nine

11  regional and local public water supply agencies established under the laws of the State of

12  California, including each of the twenty-seven members of the State Contractors, have contracted

13  with the State of California for a supply of water from the SWP.

14    26. By means of pumping facilities located near Tracy, California, water is pumped by

15  the SWP from the southern end of the Delta for transmittal to end users in the Southern San

16  Francisco Bay Area via the South Bay Aqueduct, and in the San Joaquin Valley, along the

17  Central Coast, and in Southern California via the California Aqueduct.  Particularly during the

18  winter months, when water is not generally needed for agricultural uses, SWP facilities pump

19  water from the Delta for transport to and storage in San Luis Reservoir, a joint use facility shared

20  by the State with the Federal Government that is located near the City of Los Banos.  Such water

21  is stored in San Luis Reservoir until it is needed for irrigation, municipal, and other uses.

22    27. Recently, DWR has been able to deliver only a small fraction of the SWP water

23  for which the members of the State Contractors hold water supply contracts.  On October 29,

24  2008, DWR issued a notice to its contractors, including each of Plaintiff's members, indicating

25  that initial SWP allocations for 2009 would be only 15 percent of contractual entitlements.  The

26  notice advised DWR's contractors that hydrologic conditions in 2008 have resulted in a "critically

27  dry" water year in both the Sacramento and San Joaquin regions and that SWP storage conditions

28  going into the 2009 water year, as a result, are far below average.  A true and correct copy of

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

- 6 -      COMPLAINT FOR DECLARATORY AND
                  INJUNCTIVE RELIEF

1   DWR's notice to its water supply contractors is attached as Exhibit "1" to Plaintiff's Request for

2   Judicial Notice ("RJN").  On February 27, 2009, the Governor of California declared a formal

3   State of Emergency to "combat California's third consecutive year of drought."  A true and

4   correct copy of the Governor's Emergency Proclamation is attached as Exhibit "2" to Plaintiff's

5   RJN.  Between March and May of 2009, DWR issued three additional notices indicating that

6   2009 SWP allocations would increase to 20 percent, 30 percent, and 40 percent of contractual

7   entitlements.  Notwithstanding these gradual increases, the 2009 SWP allocations remain 60

8   percent below the water supply volumes for which the members of the State Contractors hold

9   contractual entitlements.  True and correct copies of the DWR's March 18, 2009, April 15, 2009

10  and May 20, 2009 notices to its water supply contractors are attached as Exhibits "3," "4" and "5"

11  to Plaintiff's RJN, respectively.

12          28.     The restrictions imposed by the BiOp will result in additional operational

13  limitations upon the SWP.  As a result of Defendants' improper actions, their failure to use the

14  best available scientific data in developing the BiOp, their other failures to comply with the

15  requirements of the ESA as described herein, and their failure to comply with NEPA, the State

16  Contractors and its member agencies will receive significantly less SWP water pursuant to their

17  water supply contracts than they would have received in the absence of Defendants' defective

18  BiOp.

19          29.     Unless Plaintiff's prayer for relief is granted and the BiOp's restrictions are

20  declared invalid, the State Contractors' interest in SWP water supplies will be adversely affected

21  and irreparably injured by Defendants' unlawful actions.

22                  **BACKGROUND REGARDING THE BIOLOGICAL OPINION**

23          30.     Spring-run Chinook salmon (*Oncorhynchus tshawytscha*) are fish that enter fresh

24  water in the spring, spawn in the fall and reside in fresh water for a year or more following

25  emergence before emigrating to the ocean.  Naturally-spawning populations of the spring-run

26  Chinook reside in the upper Sacramento River and its tributaries.  The Central Valley spring-run

27  Chinook evolutionary significant unit ("ESU") is listed as threatened under the ESA.  70 Fed.

28  Reg. 37160 (June 28, 2005).  Spring-run Chinook critical habitat was designated in 2005.  70 Fed.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

Reg. 52488 (Sep. 2, 2005).

31.    Winter-run Chinook salmon (*Oncorhynchus tshawytscha*) enter fresh water in winter or early spring and spawn and rear in the upper Sacramento River starting in the spring or early summer.  After four to seven months of river life, juvenile winter-run Chinook migrate to the ocean.  The Sacramento River winter-run Chinook ESU is listed as endangered under the ESA.  70 Fed. Reg. 37160.  Critical habitat was designated for the winter-run Chinook in 1993. 58 Fed. Reg. 33212 (June 16, 1993).

32.    Central Valley steelhead (*Oncorhynchus mykiss*) enter Central Valley streams in the winter months, spawn shortly thereafter and the juveniles remain in the fresh water for up to two years before emigrating to the ocean.  The Central Valley steelhead Distinct Population Segment ("DPS") is listed as threatened under the ESA.  71 Fed. Reg. 834 (Jan. 5, 2006).  Critical habitat was designated for the Central Valley steelhead in 2005.  70 Fed. Reg. 52488.

33.    North American green sturgeon (*Acipenser medirostris*) spawn in the Sacramento River, but do not spawn in the Feather or San Joaquin Rivers.  The Southern DPS of green sturgeon was listed as threatened in 2006.  71 Fed. Reg. 17757 (Apr. 7, 2006).  Critical habitat has been proposed but not designated for the Southern DPS of green sturgeon.  73 Fed. Reg. 52084 (Sep. 8, 2008).

34.    Southern Resident killer whales (*Orcinus orca*) are found primarily in the coastal waters off Washington, Oregon and Vancouver Island in British Columbia and, until recent sightings were reported off the central California coast, were not thought to range further south than the mouth of the Columbia River.  Killer whales consume a variety of fish species, including Chinook salmon.  The Southern Resident killer whale DPS is listed as endangered under the ESA. 70 Fed. Reg. 69903 (Nov. 18, 2005).

35.    On October 22, 2004, NMFS issued a Long-Term CVP and SWP OCAP Biological Opinion ("2004 BiOp") on the effect of continuing CVP and SWP operations on the spring-run Chinook, winter-run Chinook, CV steelhead, CCC steelhead, and Southern Oregon/Northern California Coast Coho salmon.  The 2004 BiOp determined that the proposed CVP and SWP operations would not cause jeopardy to the studied species.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

36.     A coalition of environmental organizations challenged the conclusions of the 2004 BiOp regarding the effect of CVP and SWP operations on salmonid species.  A complaint was filed on August 9, 2005 and amended on September 11, 2006.  In April of 2008, the District Court for the Eastern District of California, in *Gutierrez*, No. 1:06-CV-00245-OWW-GSA*, invalidated the 2004 BiOp.  However, the *Gutierrez* court remanded the BiOp without vacatur, allowing CVP and SWP operations to continue pending the preparation of a new BiOp and any interim requirements that the court might propose.  On July 18, 2009, the court issued Findings of Fact and Conclusions of Law which determined, *inter alia*, that interim water supply restrictions, beyond those already required by a biological opinion issued by the U.S. Fish and Wildlife Service ("USFWS") for the Delta smelt, were not required at that time.  The court affirmed this conclusion in a more recent order dated October 21, 2008.

37.     The *Gutierrez* court directed that a new NMFS biological opinion be issued by Defendants.  After requesting and receiving an extension of time to do so, Defendants issued their new BiOp on June 4, 2009.  Unlike the 2004 BiOp, the new BiOp issued by Defendants now also examines the impact of the operations of the SWP and CVP proposed in the OCAP on the green sturgeon and killer whale, but no longer addresses the Oregon/Northern California Coast Coho salmon.  Also, the new BiOp now concludes that the Project operations <u>will</u> "jeopardize" the continued existence of the winter-run Chinook, spring-run Chinook, CV steelhead and green sturgeon (the "Subject Fish Species"), and killer whale (collectively, the "Subject Species").

38.     In addition to reversing its prior no jeopardy finding, the BiOp also reverses its prior conclusion regarding the effect of CVP and SWP operations on critical habitat and now concludes that such operations will adversely modify critical habitat for winter-run Chinook, spring-run Chinook and CV steelhead, and proposed critical habitat for the green sturgeon (the "Subject Critical Habitat").

39.     For the reasons described herein, the new BiOp is legally defective because it does not comply with the requirements of the ESA, NEPA or the APA.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

## FIRST CLAIM FOR RELIEF

**Against All Defendants for Violation of the Administrative Procedure Act for Failure to Comply with Requirement of the ESA to Use Best Available Scientific Data**

40.     Plaintiff realleges and incorporates, as if fully set forth herein, each and every allegation contained in paragraphs 1 through 39, inclusive, of this Complaint.

41.     Section 7(a)(2) of the ESA provides that federal agencies "*shall* <u>*use*</u> the best scientific and commercial data available" in ensuring that actions authorized, funded, or carried out by a federal agency do not jeopardize the continued existence of any endangered species.  16 U.S.C. § 1536(a)(2) (emphasis added); *Bennett v. Spear*, 520 U.S. 154, 176 (1997); *see also* 50 C.F.R. § 402.14(g)(8).  "The obvious purpose of the requirement that each agency 'use the best scientific and commercial data available' is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise." *Bennett,* 520 U.S. at 176.  An additional purpose of the requirement that the best available scientific data be used is to protect the economic interests of parties adversely affected by erroneous biological opinions, which interests are also protected by the ESA and the APA.  *Id.* at 177-78.  Even where federal agencies are afforded discretion in making determinations, that "does not confer discretion to ignore the required procedures of decisionmaking," including the requirement to use the best available science.  *Id.* at 172, *citing SEC v. Chenery Corp.*, 318 U.S. 80, 94-95 (1943).  Furthermore, the BiOp must provide a detailed discussion of the effects of the proposed action that identifies the data upon which the decision is based.  16 U.S.C. § 1536(b)(3)(A).  Thus, in preparing and approving the BiOp, Defendants were required to *use* and to demonstrate the use of the best available scientific data.  However, Defendants failed to do so.

42.     Over a lengthy period of time prior to issuance of the BiOp, Plaintiff and others including DWR, the Bureau and individual members of the State Contractors engaged in repeated efforts to provide Defendants with the best available scientific data related to the Subject Species.  Plaintiff, for example, participated in the process to develop the Biological Assessment and submitted multiple comment letters to Defendants, including a May 27, 2009 letter submitted by the State Contractors and San Luis Delta-Mendota Water Authority regarding the best available

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

scientific data relevant to the analyses and conclusions in the BiOp, a true and correct copy of which is attached hereto as Exhibit "A."  Additional comments regarding the best available scientific data were provided to Defendants by the State of California acting through DWR, including an April 20, 2009 letter, by the Department of Interior acting through the Bureau, including an April 24, 2009 letter, and by the Kern County Water Agency, including an April 15, 2009 letter.  True and correct copies of the letters are attached hereto as Exhibits "B," "C," and "D".

43.     Defendants ignored or failed to respond to comments provided by Plaintiff, by DWR, by Reclamation and by their own peer reviewers.

44.     Defendants violated the mandate of Section 7 of the ESA to use the best available scientific data in at least the following ways: (1) Defendants disregarded relevant data without explanation and arbitrarily selected the data they did rely upon; (2) Defendants based their analyses on data that was incorrect and/or incomplete; (3) Defendants reached conclusions that are internally inconsistent; (4) Defendants relied on unsupported speculation rather than data or analysis; (5) Defendants failed to quantify the Project's effects on the Subject Species despite the availability of quantitative scientific data, and (6) Defendants displayed a pervasive bias against the SWP and CVP, to the exclusion of all other potential stressors (i.e., causes of harm) to salmonid species and green sturgeon.

45.     Defendants failed to use the best available scientific data in that they disregarded relevant data without explanation and arbitrarily selected certain other data in reaching the BiOp's conclusions.  *See Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (stating "the FWS cannot ignore available biological information").  Thus, for example:

a.     The BiOp improperly refuses to utilize and ignores the use of salmonid life cycle and life stage models and instead relies on non-quantitative methods.  The Salmonid Population Model ("SALMOD") simulates the dynamics of salmonid populations and has been widely used for over a decade.  The Interactive Object Oriented Salmon Simulation ("IOS") model was explicitly designed for application in assessing the status and trends of at-risk winter-run salmonids.  NMFS failed to include the IOS model and its data, and

BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

disregarded any other salmonid life cycle model such as SALMOD in its evaluation of the effects of SWP and CVP operations on the species referenced in the BiOp even though: (1) the IOS modeling results were used by the Bureau in the Biological Assessment; (2) the CALFED Science Review Panel in its *Independent Review of the 2008 NMFS Analytical Framework for its OCAP Biological Opinion* (October 31, 2008) ("Independent Review (2008)") "strongly encouraged" NMFS to use the IOS and SALMOD modeling results in quantifying population responses; (3) NMFS has used life cycle models to evaluate project effects in other biological opinions and, (4) the IOS has an expanded and improved "Delta Pathways" sub-model that allows exploration and quantification of water project operation effects on salmon survival and migration through the Delta. True and correct copies of CALFED's Independent Review (2008) and the relevant portions of the Bureau's Biological Assessment are attached as Exhibits "6" and "7" to Plaintiff's RJN, respectively.

b.    Rather than utilizing the best available numerical scientific data of the Project's effects upon the Subject Species by utilizing life cycle models as they did in other biological opinions, NMFS fails to *use* any quantitative assessment of Subject Species' life cycle or mortality in the BiOp. In fact, the BiOp explicitly declines to utilize established quantitative life cycle approaches including spawner-to-recruit ("SRR") or adult-to-smolt ("ASR") ratios, acoustic tagging studies or computer models, such as IOS and the *Oncorhynchus* Bayesian Analysis (OBAN) model. *See* BiOp at 66-68. To the extent that the BiOp discusses fish mortality models, in particular those utilized by the Bureau in the Biological Assessment, the discussion is superficial and the BiOp fails to *use* or describe in detail the data synthesized or produced from any of the models in reaching its jeopardy conclusion. *See, e.g.*, BiOp at 269-272 (stating that "[t]he SALMOD model shows a reduction in juvenile production resulting from [P]roject operations" but failing to isolate species-specific reductions, convert the reduction into a population-level effect, or otherwise utilize the data to demonstrate that the Project's incremental effect will cause jeopardy to any of the Subject Species).

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

c.      The BiOp arbitrarily excludes data from a number of small populations of spring-run Chinook salmon in its assessment of ESU viability but includes data from these same populations when assessing the Project's effects and imposing recovery actions for the same ESU.  The spring-run Chinook ESU includes populations in the Sacramento River, Antelope Creek, Battle Creek, Beegum Creek, Big Chico Creek, Butte Creek, Clear Creek, Deer Creek, Feather River, Mill Creek and Yuba River, and the BiOp includes each of these populations in its assessment of the impact of CVP and SWP operations on the survival and recovery of the ESU.  BiOp at 94; *see e.g.* BiOp at 474-487 (analyzing Project effects on spring-run Chinook in Clear Creek, Beegum Creek, and the mainstem Sacramento River).  However, in its viability assessment, where additional demographic populations would likely reduce the risk of extinction and increase the time to range-wide species disappearance, only the populations in Deer, Mill and Butte creeks are considered.  BiOp at 94-97; *see also* BiOp at 84 ("ESU viability depends upon the number of populations and subunits within the ESU").  The BiOp explains, speculatively, that the excluded populations are "*presumably* dependant on strays from other populations" (BiOp at 472) (emphasis added) and that Deer, Mill and Butte creek populations "are *probably* the best trend indicators" (BiOp at 96) (emphasis added).  The BiOp does not offer empirical data to substantiate this claim.

d.      The BiOp fails to perform any quantitative analysis of the effect of Project operations on population viability criteria such as abundance and productivity despite the availability of scientific methods for quantifying such effects.  For example, the Bureau's Biological Assessment contained quantitative data and models that represent the best available science and could have been used to quantify the impacts of the OCAP on salmonid viability.  However, rather than employ the models used in the Biological Assessment to develop a quantitative impact analysis, the BiOp, instead, based its determination that the Projects would reduce the abundance of winter-run Chinook entirely on non-numeric classifications, matrices (Table 9-1) and a decision-making tree (Table 9-2).  BiOp at 451-468.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

e.      The BiOp arbitrarily disregards the increase in winter-run Chinook salmon population abundance that occurred between the mid-1990s and 2006, which period included drought years.  Indeed, NMFS acknowledged that biological studies have relied upon the population abundance data from this period to conclude that the winter-run Chinook "satisfies the low-risk criteria for population size, population decline and catastrophe."  BiOp at 86; s*ee, e.g.*, Lindley et al., *Framework for Assessing Viability of Threatened and Endangered Chinook Salmon and Steelhead in the Sacramento-San Joaquin Basin* (2007) ("Lindley et al. (2007)").  A true and correct copy of Lindley et al. (2007) is attached hereto as Exhibit "E."  In fact, NMFS' own data shows previous drought years had worse population declines than 2007 and 2008 and recovered.  BiOp at 83.  However, despite the existence of scientific data showing improvements in winter-run Chinook abundance in spite of drought periods, and a related conclusion that the species is at a low risk of extinction based upon multiple criteria, NMFS concludes that the winter-run Chinook "is at risk of extinction in the foreseeable future" solely upon the basis of population declines during 2007 and 2008.  BiOp at 86.

f.      The BiOp concedes that "stressors" in the Delta, other than the water projects, have substantively contributed to the currently depressed condition of the populations of the Subject Species but fails to undertake any substantial analysis of their impacts.  BiOp at 135-158.  Other stressors identified in the BiOp include, *inter alia*, existing dams and diversions, predation and habitat alteration from non-native species, poor water quality in shipping channels, ammonia discharges from wastewater treatment plants, discharge of pesticides, river deepening and channelizing for shipping channels, loss of natural river functions in the American River, loss of marsh habitat, proliferation of boat docks and marinas, the construction of roads and levees, recreational boating, logging, mining, agriculture, and poor ocean conditions.  *See, e.g.,* BiOp at 77, 128, 130, 135-158, 175, 177, 179-180, 181-183, 185-188, 195-197, 215-216.  Despite this admission and the availability of substantial scientific data about the impacts of these non-Project related stressors, the BiOp fails to perform any analysis whatsoever to quantify the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

effects of these other factors on Subject Species abundance, to compare the relative impact of the effects of these stressors with the effects of the Projects or to analyze the impact of proposed Project operations on the species of concern in the context of these other stressors. *See* Lindley et al., *What Caused the Sacramento River Fall Chinook Stock Collapse?* (2009) ("Lindley et al. (2009)") (pre-publication report to Pacific Fisheries Management Council); *see also* April 15, 2009 KCWA letter at 19-20, Exh. D hereto. Rather, the BiOp merely concludes, without supporting scientific evidence or explanation, that the SWP and CVP are responsible for the decline of the Subject Species. *See*, *e.g.*, BiOp at 575.

g.      The BiOp disregards available scientific data that demonstrate that opening the Delta Cross Channel ("DCC") is not likely to cause more than a marginal difference in fish diversion rates into the central Delta and that salmonid survival probabilities are higher when the DCC is open than when it is closed. BiOp at 402-410; *see* May 27, 2009 SWC letter at 21-22, Exh. A hereto citing Burau et al., *Sacramento/San Joaquin River Delta Regional Salmon Outmigration Study Plan, Appendix B – Summary of Mark-Recapture Modeling For North Delta Pilot Study Winter 2006/2007* (2007) ("Burau et al. (2007)") (proportion of fish diverted when DCC was opened and closed were 28% and 18%, respectively, with a 95% confidence interval for opened and closed results overlap); *see also* Ken B. Newman, CALFED, *An Evaluation of Four Sacramento-San Joaquin River Delta Juvenile Salmon Studies* (2008) ("Newman (2008)") (opening the DCC decreases salmon survival only marginally, and with substantial uncertainty in outcome); May 27, 2009 SWC letter at 21-22, Exh. A hereto. True and correct copies of Burau et al. (2007) and Newman (2008) are attached hereto as Exhibits "F" and "G," respectively. Instead, after ignoring the best available scientific data, the BiOp simply assumes, without the support of available scientific data, that "[i]f the DCC gates are opened … a *significantly greater* proportion of … juvenile fish will be diverted into the central Delta." BiOp at 406 (emphasis added).

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

h.      The BiOp disregards available scientific data obtained from the coded wire tagging of naturally produced Central Valley Chinook salmon in Butte Creek which demonstrate that naturally produced salmon smolts may be at least 80% less likely than hatchery fish to be entrained at south Delta export facilities.  *See* May 27, 2009 SWC letter at 23-24, Exh. A hereto; *see also* April 15, 2009 KCWA letter at 18, Exh. D hereto. Despite the availability of this data, as well as NMFS' own acknowledgment of a large body of evidence suggesting that hatchery-raised salmon smolts suffer greater mortality in the wild than do naturally produced smolts, the BiOp applies hatchery mortality data to wild salmon.  BiOp at 344, 464.

i.      The BiOp disregards data compiled at the SWP and CVP export facilities of the various salvaged fish species, including juvenile Chinook salmon, that show the relationship between salvage and export is not linear, as the BiOp suggests.  Instead, available scientific data show that the relationship is, in fact, curvilinear: when flows are less than -5,000 cfs, the level of salvage at the project pumps remain low and that salvage levels increase significantly only when flows exceed -5,000 cfs.  *See* May 27, 2009 SWC Letter at 2-3, Exh. A hereto.  This curvilinear relationship has been used as a basis for the interim remedy to protect the delta smelt and for management actions by the California Department of Fish and Game ("CDFG") to protect longfin smelt, but is ignored by the BiOp .  The BiOp assumes, without the support of best available scientific data, that "the number of fish entrained at the pumps is predicted to increase in proportion to the pumping increases."  BiOp at 345.

j.      The BiOp disregards published scientific studies that demonstrate there is no strong link between trends in abundance of Chinook salmon and killer whales despite NMFS' use of this same data in prior biological opinions.  *See* Biological Assessment at 14-7 (quoting NMFS in 2007 as stating that "the available information does not support a strong link between the trends in abundance of [Chinook salmon] and the abundance of Southern Resident killer whales");  *see also* May 27, 2009 SWC letter at 12, Exh. A hereto.  Rather, the BiOp assumes, without the support of best available scientific data,

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    that the purported increase in risk of extinction of Chinook salmon caused by the Project

2    increases the risk of a permanent reduction in prey for killer whale, which may cause

3    physiological effects, impair reproductive success, or compromise immune function in the

4    killer whales, which in turn increases the risk of extinction of killer whales, resulting in a

5    jeopardy determination.  BiOp at 573-575.

6        46.    Defendants use data that are incorrect, incomplete or incompatible with other

7    scientific data, and the resulting assumptions in the BiOp that are based upon these data are

8    scientifically unsupportable and constitute a failure to use the best available scientific data in

9    violation of ESA requirements.  Thus, for example:

10        a.    The BiOp's assumption that green sturgeon are at substantial risk of

11    population decline is scientifically unsupportable because the only data used by

12    Defendants to assess the green sturgeon's population status are not reliable.  BiOp at 120,

13    124, 126; *see also* May 27, 2009 SWC letter at 13, Exh. A.  Estimates of green sturgeon

14    abundance are derived using a ratio of green sturgeon to white sturgeon caught during

15    surveys conducted by CDFG in San Pablo Bay.  BiOp at 120.  As the BiOp

16    acknowledges, "there are many biases and errors associated with these data, and CDFG

17    does not consider these estimates reliable, since the population estimates are based on

18    small sample sizes, intermittent reporting, and inferences made from white sturgeon

19    catches."  BiOp at 120.  Nonetheless, based upon this "very uncertain" data (BiOp at 124),

20    the BiOp assumes that the population of green sturgeon is relatively small and that the

21    species is at substantial risk of future population declines (BiOp at 124, 126).

22        b.    The BiOp assumes that "fish respond[] to flow and export levels when

23    moving downstream."  BiOp at 380.  However, acoustical studies in the report cited by the

24    BiOp to support this contention give no indication that fish respond to export levels.  *See*

25    San Joaquin River Group Authority's *2007 Annual Technical Report*.

26        c.    The BiOp uses Particle Tracking Model (PTM) results to simulate

27    salmonid behavior and determine, *inter alia*, routes of salmonid travel to predict potential

28    entrainment effects of the Project and the timing of salmonid migration.  BiOp at 65, 380-

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

- 17 -                COMPLAINT FOR DECLARATORY AND
                                                                                          INJUNCTIVE RELIEF

381, 641.   However, juvenile salmonids, unlike particles, are actively swimming organisms.  In fact, the authors of the PTM study cited in the BiOp clarify that their study focused on delta smelt and their results "may be less applicable to larger, more competent organisms" and do not "represent actual movements of salmon."   W.J. Kimmerer and M.L. Nobriga, *Investigating Particle Transport and Fate in the Sacramento-San Joaquin Delta Using a Particle Tracking Model*, San Francisco Estuary and Watershed Science, Volume 6, Issue 1, Article 4 (2008) at 17, 18, a true and correct copy of which is attached hereto as Exhibit "H."  Furthermore, the timing of salmonid migration adopted by NMFS in its BiOp based upon use of the PTM is contradicted by data compiled by the fish salvage facilities and coded wire tag experiments conducted by the USFWS.  *See* April 24, 2009 Bureau letter, Attachment 1, Exh. C.   Therefore, there is no scientific justification for the use of the PTM results as a surrogate for salmon movement throughout the Delta.   Because emigration dates are a key determinant of the environmental conditions and water operations to which the smolt will be exposed, NMFS' estimation of the proportionate effect of the Project and natural ocean conditions is not accurate.  Similarly, estimated survival rates based upon PTM-projected routes through the Delta are not accurate.

d.      The BiOp states that only winter steelhead are present in the Central Valley.  BiOp at 104.  However, the best available scientific data show that the primary native run of steelhead to the Sacramento Basin, upstream of the Feather River, was summer steelhead, not winter steelhead.  *See* Cramer et al., *The Status of Steelhead Populations in California in Regards to the Endangered Species Act* (1995) ("Cramer (1995)"); Hallock et al., *An Evaluation of Stocking Hatchery-Reared Steelhead Rainbow Trout (Salmo gairdneri gairdneri) in the Sacramento River System* (1961) ("Hallock (1961)"); *see also* May 27, 2009 SWC letter at 18, Exh. A hereto.

47.      Defendants acted arbitrarily and failed to use the best available science, as demonstrated by the BiOp's internally inconsistent conclusions and its citation to the same science to support different, contradictory conclusions. *See Burford*, 848 F.2d at 1454; *Northern*

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

1  *Spotted Owl v. Hodel*, 716 F. Supp. 479, 483 (W.D. Wash. 1988)  Thus, for example:

2          a.      The BiOp acknowledges that multiple stressors have adverse impacts to

3  salmonids and green sturgeon.  *See*, *e.g.*, BiOp at 135-158.  Despite this acknowledged

4  existence of substantial scientific data showing adverse impacts to salmonid and green

5  sturgeon populations due to these other stressors, the BiOp states that the incremental

6  contributions of these other stressors are generally "unknown," but nevertheless concludes

7  that past SWP and CVP operations are primarily responsible for the decline of these

8  species.  *See*, *e.g.*, BiOp at 575.

9          b.      The BiOp inconsistently concludes that the winter-run Chinook "is not

10  replacing itself, and is at risk of extinction in the foreseeable future" (BiOp at 86) despite

11  its contemporaneous admissions: (1) that "cohort replacement rates from 1995 through

12  2006 were stable or increasing, indicating a positive growth rate trend" (BiOp at 449);

13  (2) that an extensive body of evidence demonstrates that subsequent declines in Chinook

14  populations in 2007 and 2008 were due to "unusual and poor ocean conditions" in 2005

15  and 2006 (BiOp at 149); and (3) that more favorable ocean conditions, which began in

16  2007 and persisted throughout 2008, "point toward a highly favorable marine environment

17  for those juvenile salmon that entered the ocean in 2008" (BiOp at 151).   As

18  acknowledged by NMFS, reported and available scientific data indicate that decreases in

19  salmonid populations during 2007 and 2008 were attributable to dramatic changes in the

20  ocean environment in 2005 and 2006, not to Project operations.  *See* May 27, 2009 SWC

21  letter at 7, Exh. A; BiOp at 149-151.  In fact, reported data readily available to NMFS

22  demonstrate that the unusually poor ocean conditions in those years caused declines in the

23  populations of many key prey of salmonids during the same years.  *See* May 27, 2009

24  SWC letter at 7, Exh. A.  NMFS also acknowledged reported and available scientific data,

25  such as negative Pacific Decadal Oscillation values, colder sea surface temperatures, an

26  earlier spring transition, and above average upwelling, that suggest ocean conditions

27  "have substantially improved" and that the Subject Fish Species populations will

28  experience growth in upcoming years.  BiOp at 150-151.

Best Best & Krieger LLP
Attorneys At Law
Riverside

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

c.     The BiOp applies estimates of salmon mortality generated by tagging *hatchery* fish to naturally-spawned, untagged, volitionally migrating salmon populations. BiOp at 375-381.  Such application is incompatible with NMFS' acknowledgement that data suggests hatchery-raised salmon smolts suffer greater mortality than naturally-spawned smolts.  BiOp at 146, 348; *see* May 27, 2009 SWC letter at 23-24, Exh. A; *see also* April 15, 2009 KCWA letter at 17-18, Exh. D.   Available scientific studies demonstrate that hatchery-raised juvenile salmon exhibit behavior that makes them more susceptible to disease, predation and diversions, including a lack of predator avoidance skills, the tendency to remain near the surface and the tendency to reverse orientation and travel tail first in the current.  *See* May 27, 2009 SWC letter at 23, Exh. A.

48.     The BiOp utilizes extensive, unsupported speculation as a basis for many of its conclusions.  This violates the ESA because, "while the [agency] can draw conclusions based on less than conclusive scientific evidence, it cannot base its conclusions on no evidence."  *Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1094-95 (9th Cir. 2005), *citing Nat'l Ass'n. of Home Builders v. Norton*, 340 F.3d 835, 847 (9th Cir. 2003). Thus, for example:

a.     The BiOp states that: "Fish that pass through the [Project export facilities'] louver array *are lost forever to the population*.  This loss represents not only a loss of individual fish, but a *decline in the population abundance as a whole*, as these fish represent the survivors of the initial downstream emigration from spawning areas upstream to the Delta, a journey with its own *intrinsically high rate of mortality*."  BiOp at 344.  Even if the unreliability of the BiOp's broad, presumptive statements regarding individual fish losses caused by louvers at the export facilities and the "intrinsic high rate of mortality" experienced during emigration is overlooked, the BiOp fails to cite to any scientific evidence that ties these impacts to a population level effect or to the biological significance of the SWP and CVP louvers.  *See* May 27, 2009 SWC letter at 11-12, Exh. A.  The BiOp's conclusion regarding the louver's impact on population abundance is therefore speculative.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

b.      The BiOp assumes, without reference to any scientific data or literature, that "[j]uvenile green sturgeon migrate downstream and feed mainly at night" and that "their nocturnal swim behavior may place them at risk for entrainment by local agricultural diversions in the upper river reaches."  BiOp at 119, 120.  There is no scientific basis for this assumption and none is cited in the BiOp.

c.      The BiOp speculates, without supporting scientific data, that green sturgeon may have spawned historically in the Feather and San Joaquin River systems and that they would spawn currently in both systems but for the construction of dams in 1968 and the late 1800s, respectively.  BiOp at 115.  Such speculation is contrary to the available scientific evidence which is that (1) "[g]reen sturgeon occasionally range into the Feather River but numbers are low and there is no data documenting current or historical spawning," and (2) while white sturgeon are regularly observed in the upper San Joaquin River and may occasionally spawn there, "[n]o adult or juvenile green sturgeon have been documented in the San Joaquin River upstream from the Delta."  Beamesderfer et al., *Use of Life History Information in a Population Model for Sacramento Green Sturgeon* (2007).

d.      The BiOp assumes, without reference to scientific data, that the Project's impact on Chinook salmon will cause jeopardy to killer whales.  BiOp at 573-574, 575.  The BiOp reaches this conclusion without, *inter alia*, quantifying or otherwise detailing the amount of prey consumed by killer whales in Central California, the extent to which the Project operations may reduce the population of Central Valley Chinook salmon or the availability of other species that might supplement the killer whales' diet and minimize the impact of any reduction in Chinook salmon.

49.      The BiOp fails to use available numerical scientific data to quantify baseline and incremental Project effects.  *See Roosevelt Campobello Int'l Park Comm'n v. U.S. E.P.A.*, 684 F.2d 1041, 1052-1053 & fn.9 (1st Cir. 1982).  In fact, the BiOp explicitly disregards numerical data used in the Biological Assessment and provided in numerous comment letters, including spawner-to-recruit ("SRR") or adult-to-smolt ("ASR") ratios, data collected from acoustical

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

tagging studies, and species life cycle and mortality modeling results.  *See, e.g.*, ¶ 45(b), above.  Even when the BiOp claims to consider numerical data, it fails to *use* the data to reach or support its jeopardy determination.  *Id.*   At the very least, the BiOp should have used the available numerical data to validate the conclusions reached by its qualitative analysis.  Instead, the BiOp disregards numerical data that contradicts NMFS' assumptions and qualitatively-reached conclusions.  *See, e.g.*, ¶¶ 45(f)-(i).

50.   The foregoing paragraphs demonstrate that bias forms the basis of much of the BiOp.  For example, when evidence is unclear or contradictory, the BiOp utilizes that lack of evidence to *dismiss* non-project impacts to the Subject Species, while at the same time using the same lack of evidence as the basis for concluding that the SWP and CVP *will* have adverse impacts on the Subject Species.  *See*, *e.g.*, ¶¶ 45(f), 47(a), above.  For example, the BiOp recognizes that thousands of other water diversions exist in the Delta besides the SWP and CVP (BiOp at 136, 445); that most of these other diversions do not have fish screens or are insufficiently screened, including "98.5 percent of the 3,356 diversions included in a Central Valley database" and "[m]ost of the 370 water diversions operating in Suisun Marsh" (BiOp at 445); and that the impacts of these other diversions are not known, though they do entrain salmonids (BiOp at 89, 92 (noting the Biological Assessment estimates over 7,000 juvenile winter-run are entrained each year)).   Nonetheless, the BiOp concludes – incredibly – that entrainment of fish by these other diverters is a result of SWP and CVP operations.  BiOp at 265-266.  Also, the BiOp acknowledges the scarcity and unreliability of data on green sturgeon, yet, rather than declining to evaluate the status of the green sturgeon or the Project's impact on the green sturgeon for lack of scientific support, the BiOp cherry-picks from the existing data to reach a jeopardy determination.  BiOp at 120-124.

51.   Defendants' failure to utilize the best available scientific data in preparing and adopting the BiOp violates the ESA and the rule-making requirements of the APA.  5 U.S.C. § 553(b), (c).  Moreover, Defendants have failed to follow applicable policies and guidelines, including the NMFS Information Standards Policy, the DOC Information Quality Guidelines, and the NOAA Information Quality Guidelines.   These errors, the analyses, reasoning, and

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

conclusions of the BiOp, and Defendants' actions described herein, are arbitrary, capricious, an abuse of discretion, not in accordance with the law, in excess of statutory authority, and without observance of procedure required by law, in violation of Section 7 of the ESA and its implementing regulations, and the standards of the APA. *See Northwest Ecosystem Alliance v. United States Fish & Wildlife Service*, 475 F.3d 1136, 1147 (9th Cir. 2007) (USFWS must consider best available science even if it falls short of scientific certainty), *citing Center for Biological Diversity v. Lohn*, 296 F. Supp. 2d 1223, 1236-40 (W.D. Wash. 2003) (agency's reliance on outdated science or improper assumptions is arbitrary and capricious when the best available science shows these to be incorrect).

52.     Plaintiff has exhausted any and all administrative remedies required by law and has performed any and all conditions precedent to the filing of this action.

53.     Plaintiff's interests have been, are, and will continue to be directly and adversely affected by Defendants' failures and unlawful actions.

54.     Plaintiff has no plain, speedy or adequate remedy at law and, unless relief is granted as prayed, Plaintiff's interests in SWP water supplies will be adversely affected and irreparably injured by Defendants' unlawful acts.

## SECOND CLAIM FOR RELIEF

**Against All Defendants for Violation of the Administrative Procedure Act (5 U.S.C. § 706 et seq.) for Failure to Make Findings or Undertake Analysis Regarding the BiOp's Reasonable and Prudent Alternative**

55.     Plaintiff realleges and incorporates, as if fully set forth herein, each and every allegation contained in paragraphs 1 through 54, inclusive, of this Complaint.

56.     Under Section 7 of the ESA (16 U.S.C. § 1536(b)(3)(A)), if a biological opinion finds that a proposed agency action will cause jeopardy to the species or result in the adverse modification of its critical habitat, Defendants are required to suggest reasonable and prudent alternatives ("RPAs") to the proposed action that Defendants believe can be taken in implementing the agency action and that will not cause jeopardy to the species or result in the adverse modification of critical habitat. *See National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 127 S.Ct. 2518, 2526 (2007) (citing 16 U.S.C. § 1536(b)(3)(A) and

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

50 C.F.R. § 402.14(h)(3).)  The RPAs must be designed to avoid the specific consequences of the proposed action, i.e., the Project effects.  *See Bennett v. Spear*, 520 U.S. at 158 ("[i]f the Service concludes that the proposed action will [result in jeopardy or adverse habitat modification], § 1536(a)(2), the Biological Opinion must outline any 'reasonable and prudent alternatives' that the Service believes will avoid *that* consequence").  Notwithstanding the requirements of Section 7 of the ESA, Defendants fail to explain how each RPA action is linked to specific harm caused by the Project and will limit that harm so as to avoid jeopardy to each Subject Species.  Furthermore, Defendants blatantly adopt RPA actions that place the onus on the Plaintiff to counter the harm caused by baseline effects, not just Project effects.  As one example, Defendants' RPA includes Action V, which imposes a Fish Passage Program to reintroduce Subject Fish Species above certain dams.  However, the BiOp fails to adequately explain how the implementation of Action V will protect any of the Subject Fish Species from the jeopardy purportedly caused by the proposed <u>operations</u> of SWP and CVP.  In fact, the BiOp explicitly acknowledges that RPA actions such as Action V "call for restoring habitat or providing fish passage above dams even though the water projects are not directly responsible for the impaired habitat or the blocked passage."  BiOp at 576.  Thus, Defendants cannot demonstrate that Action V will lessen the incremental impact of Project <u>operations</u>.

57.    Pursuant to Section 7 of the ESA and title 50, parts 402.02 and 402.14(g) of the Code of Federal Regulations – adopted to implement the ESA – if Defendants adopt a "jeopardy" biological opinion, they are required to analyze their proposed RPAs to determine whether: (1) the RPA can be implemented in a manner consistent with the intended purpose of the agency action; (2) the RPA can be implemented consistent with the scope of the action agency's legal authority and jurisdiction; (3) the RPA is economically and technologically feasible; and (4) the RPA will avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of its critical habitat.  50 C.F.R. §§ 402.02, 402.14(g).    Defendants expressly acknowledge the applicability of their implementing regulations, including the requirements of an RPA, in the BiOp.  BiOp at 575 (citing 50 C.F.R. § 402.02).  However, despite Defendants' acknowledgement of the requirements for an RPA, the

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

BiOp fails to adequately make findings, undertake analysis or otherwise determine whether the RPA actually imposed satisfies the requirements of Section 7 of the ESA and the implementing regulations Defendants themselves have adopted.  These failures, among others, violate Section 7 of the ESA and Code of Federal Regulations, title 50, parts 402.02 and 402.14(g):

a.   The BiOp inadequately analyzes whether the RPA it adopts "can be implemented in a manner consistent with the intended purpose" of DWR's operation of the SWP.  *See* BiOp at 575.  The BiOp expressly states that the purpose of the proposed action is to "operate [the CVP and SWP] to divert, store, and convey CVP and SWP (Project) water consistent with applicable law and contractual obligations."  BiOp at 724. However, the BiOp then concludes that the RPA is consistent with this intended purpose solely because "[t]hese operational changes do not [] preclude operation of the Projects." BiOp at 724.  The BiOp does not make findings or undertake any analysis of whether the CVP or SWP can sustain NMFS-estimated water supply impacts of an average of 330,000 acre-feet per year beyond those already attributable to existing water supply limitations, including those resulting from the delta smelt BiOp adopted by the USFWS and still serve their intended purpose, including meeting their contractual obligations to the members of the State Contractors.  Furthermore, the BiOp does not consider simulations performed and reported by DWR utilizing CALSIM that estimate the water supply impact of the BiOp to the CVP and SWP to be as much as 750,000 acre-feet per annum, not 330,000 acre feet.  *See* April 24, 2009 Bureau letter, Attachment 3, Exh. C.  Thus, Defendants' findings and analysis are legally inadequate with respect to whether the protection of adult or larval/juvenile Subject Fish Species or the improvement of habitat for Subject Fish Species growth and rearing as required in the BiOp can be accomplished consistently with the intended purpose of the SWP, *viz.*, to provide much needed water for the large majority of California's population, as required by law and contract.

b.   Compounding the deficiencies of their simplistic conclusion that the RPA is "consistent" with the intended purpose of the SWP and CVP because it does not "preclude operation of the Projects," Defendants made no findings and presented no

BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

analysis in their BiOP of the relative impact of lost water supplies to the millions of Californians dependent upon the SWP compared to the expected population-level benefit to the Subject Species populations.  Defendants also made no findings and presented no analysis in their BiOp of whether there are feasible, less onerous alternatives that will prevent jeopardy to the Subject Species while better maintaining the intended purpose of the SWP and CVP to provide water deliveries to the millions of Californians who depend on the two projects for water for their homes, farms and businesses.  *See Southwest Ctr. for Biological Diversity v. Bureau of Reclamation*, 143 F.3d 515, 523 fn.5 (9th Cir. 1998) (stating the ESA does not limit the Secretary's analysis to apolitical considerations, and that if two proposed RPAs would avoid jeopardy to a listed species, the Secretary must "choose the one that best suits all of [the project's] interests, including political or business interests").

       c.     The BiOp inadequately analyzes and makes no findings regarding whether the RPA can be implemented in a manner that is consistent with the scope of DWR's legal authority and jurisdiction.  The following are among the actions prescribed by the RPA that require DWR to perform duties without Defendants' first finding that the duties are within the authority and jurisdiction of DWR:

       i.     Action I.2.3.B requires DWR to reduce CVP and SWP combined exports if the Bureau cannot hold enough cold water in Shasta Reservoir to maintain planned or mandated releases.  BiOp at 599.  Action I.2.3.B also requires DWR to increase releases from Oroville Dam if necessary to meet Delta outflow, X2, or other legal requirements.  BiOp at 599.

       ii.     Action I.2.6 requires DWR to fund a portion of the Battle Creek Salmon and Steelhead Restoration Project, as set forth in the proposed amended Delta Fish Agreement.  BiOp at 603.

       iii.     Actions 1.6.1 and 1.7 require DWR to act in cooperation with the Bureau to secure funding for and implement Yolo Bypass

Best Best & Krieger LLP
Attorneys At Law
Riverside

- 26 -

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

1  improvements and other efforts to increase seasonal floodplain

2  rearing habitat.  BiOp at 608-609, 611.

3       d.    The BiOp inadequately analyzes and makes no findings regarding whether

4  the proposed RPA can be implemented in light of the RPA prescribed by the USFWS

5  BiOp for delta smelt.  In fact, the NMFS RPA for salmonids, green sturgeon and killer

6  whales and the USFWS RPA for delta smelt contain conflicting actions, making

7  implementation of both RPAs technologically infeasible and legally outside of Plaintiff's

8  authority.

9       e.    The BiOp makes inadequate findings and insufficiently analyzes whether

10  DWR's implementation of the RPA included in the BiOp is "economically or

11  technologically feasible."  The BiOp states that "only costs to the action agency are

12  considered in determining whether a RPA meets the regulatory requirement of economic

13  feasibility" even though NMFS acknowledges that the RPA will have "potential social

14  and economic costs to the people and communities that historically have depended upon

15  the Delta for their water supply."  BiOp at 720.  Defendants made no findings and present

16  no analysis in the BiOp regarding whether such economic impacts to contractors and end

17  users make the RPA economically infeasible.  In addition, Defendants made no findings

18  and present no analysis in the BiOp of whether a more economically feasible, less costly

19  alternative exists that would prevent jeopardy.  Thus, Defendants' findings and analysis

20  were legally inadequate in regards to the economic impact of the RPA.

21  58.    Failures by federal regulatory agencies to comply with applicable legal

22  requirements can be challenged under the Administrative Procedure Act.  5 U.S.C. § 706(2);

23  *Bennett v. Spear*, 520 U.S. at 174-175.

24  59.    As a result of the improper procedures used by Defendants in preparing and

25  approving the BiOp, including their failure to demonstrate that the RPA actions will avoid

26  Project-specific jeopardy and their failure to make findings or present any analysis in the BiOp

27  regarding compliance of the BiOp's RPA with the requirements of the implementing regulations

28  of the ESA, Plaintiff's members will receive significantly less water pursuant to their water

- 27 -

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1  supply contracts than they would receive had Defendants complied with applicable legal

2  requirements.

3      60.     Plaintiff has exhausted any and all administrative remedies required by law and

4  has performed any and all conditions precedent to the filing of this action.

5      61.     Plaintiff's interests have been, are, and will continue to be directly and adversely

6  affected by Defendants' failures and unlawful actions.

7      62.     Plaintiff has no plain, speedy or adequate remedy at law and, unless relief is

8  granted as prayed, Plaintiff's interests in SWP water supplies will be adversely affected and

9  irreparably injured by Defendants' unlawful acts.

10

11  **THIRD CLAIM FOR RELIEF**

12  **Against All Defendants for Violation of Section 7 of the Endangered Species Act for Failure
    to Comply with Applicable Standards When Analyzing the Effects of the Action and
    Reaching the "Jeopardy" Determination**

13

14      63.     Plaintiff realleges and incorporates, as if fully set forth herein, each and every

15  allegation contained in paragraphs 1 through 62, inclusive, of this Complaint.

16      64.     The consultation requirements of the ESA are set forth in Section 7 of the Act and

17  are applicable only to actions in which there is discretionary federal involvement or control.

18  50 C.F.R. § 402.03; *National Ass'n of Home Builders v. Defenders of Wildlife*, 127 S.Ct. at 2526.

19  With respect to such discretionary actions, Section 7 provides that "[e]ach Federal agency shall

20  . . . insure that any action authorized, funded, or carried out by such agency (hereinafter in this

21  section referred to as an 'agency action') is not likely to jeopardize the continued existence of any

22  endangered species or threatened species or result in the destruction or adverse modification of

23  [critical] habitat."  16 U.S.C. § 1536(a)(2).  Section 7 also provides that any consultation that

24  occurs pursuant to its provisions shall be  "[s]ubject to such guidelines as the Secretary may

25  establish."  16 U.S.C. § 1536(a)(3).

26      65.     Section 7 of the ESA includes not only the consultation duties of the action

27  agency, but also the duties of the wildlife agency with which the action agency consults.  It thus

28  provides: "Promptly after conclusion of consultation . . . , the Secretary shall provide to the

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

1   Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion,

2   and a summary of the information on which the opinion is based, detailing how the agency action

3   affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). The regulations adopted

4   pursuant to Section 7 set forth the *process* the regulatory agency must follow in developing its

5   opinion about the effects of the agency action. The regulations thus provide that NMFS is

6   required to "[e]valuate the effects of the action and cumulative effects on the listed species or

7   critical habitat" and "[f]ormulate its biological opinion as to whether the action, taken together

8   with cumulative effects, is likely to jeopardize the continued existence of listed species or result

9   in the destruction or adverse modification of critical habitat." 50 C.F.R. §§ 402.14(g)(3), (g)(4),

10  (h).

11       66.    In determining whether a proposed Federal action will "jeopardize the continued

12  existence of a listed species," the "relevant inquiry is whether the 'action['s] effects, when added

13  to the underlying baseline conditions,' in the present and future human contexts, are cumulatively

14  such that they would cause jeopardy as that term is defined by law and agency regulation." *See*

15  *Pacific Coast Federation of Fishermen's Associations, et al. v. Gutierrez,* E.D. Cal. case no. 1:06-

16  CV-00245 (Findings of Fact and Conclusions of Law re the Existence of Irreparable Harm during

17  the Interim Period and Denying Plaintiffs' Requests for Emergency Interim Remedies Regarding

18  Flows on Clear Creek and Gate Operations at Red Bluff Diversion Dam (Doc. 367), July 18,

19  2008, Conclusions of Law ¶ 47). By Service regulation, "[j]eopardize the continued existence of

20  means to engage in an action that reasonably would be expected, directly or indirectly, to reduce

21  appreciably the likelihood of both the survival and recovery of a listed species in the wild by

22  reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. The

23  regulation, in turn, has been interpreted to mean that the proposed action which is the subject of

24  the consultation must be found to "considerably reduce" the abundance of the listed species.

25  *Gutierrez,* Conclusions of Law ¶¶ 32.4, 32.5 (*citing* U.S. Fish & Wildlife Service and National

26  Marine Fisheries Service Consultation Handbook: Procedures for Conducting Consultation and

27  Conference Activities Under Section 7 of the Endangered Species Act," at 4-34, (March 1998)

28  [hereinafter Consultation Handbook]).

BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

67.     Pursuant to the regulations adopted to implement the consultation requirements of Section 7, the Secretary has agreed that the "effects of the action" mean:

> [T]he direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline.  50 C.F.R. § 402.02.

Pursuant to these regulations, the "environmental baseline" includes:

> [T]he past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process.  *Id.*

Further elaborating upon the requirements of Section 7, the Service's Final ESA Section 7 Consultation Handbook states that the "environmental baseline is a 'snapshot' of a species' health at a specified point in time.  It does not include the effects of the action under review in the consultation."  Consultation Handbook, p. 4-22.  The Consultation Handbook further requires that, when determining the effect of ongoing water project operations, the Service must structure its analysis so that:

> The total effects of all past activities, <u>including effects of the past operations of the project</u>, current non-Federal activities, and Federal projects with completed section 7 consultations, form the environmental baseline;  To this baseline, future direct and indirect impacts of the operation over the new license or contract period, including effects of any interrelated and interdependent activities, and any reasonably certain future non-Federal activities (cumulative effects), are added to determine the total effect on listed species and their habitat.  Consultation Handbook pp. 4-28 to 4-29 (emphasis in original).

In addition, where a pre-existing dam has independent utility apart from the proposed Project, "[o]ngoing effects of the existing dam are already included in the Environmental Baseline and would not be considered an effect of the proposed action under consultation."  *Id.* at p. 4-27.

68.     As NMFS acknowledges in the BiOp, jeopardy resulting from baseline conditions does not justify a jeopardy determination under Section 7; the Project's effects must have an additional impact on the condition of the species.  BiOp at 59.  Pursuant to Section 7 of the ESA

and title 50, C.F.R. section 402.02, NMFS must find that the future direct and indirect impacts of the discretionary SWP and CVP operations will reduce *appreciably* the likelihood of both the survival and recovery of a Subject Species, beyond that observed under baseline conditions, for a jeopardy determination to be proper.

69.     The BiOp violates the requirements of Section 7 of the ESA, title 50, C.F.R. sections 402.02 and 402.14, and the Consultation Handbook, because Defendants failed to utilize the required methodology to determine whether the proposed Project will jeopardize the continued existence of the Subject Species or destroy or adversely modify Subject Critical Habitat.  Specifically, among other failings:

a.     The BiOp fails to properly identify the additional, discrete effects of the Project beyond the baseline.  Without isolating these incremental Project effects, the BiOp has no basis upon which to evaluate the *Project's* impact on the continued existence of the Subject Species or the destruction or modification of the Subject Critical Habitat as required by Section 7 of the ESA.  The following are among the methodological failures that prevent the BiOp from properly identifying the incremental Project effects:

i.     The BiOp improperly describes the proposed agency action under ESA review and fails to distinguish between the discretionary and non-discretionary components of SWP and CVP operations.  In fact, despite its admission that "some activities that are part of the proposed Project are non-discretionary, and their effects are also not effects of the proposed action" (BiOp at 59), the BiOp assumes without analysis or support "that all CVP and SWP operations are subject to the discretion of the project agencies and, thus, that all effects of future operations are effects of the proposed action" (BiOp at 60).  For example, certain aspects of the operation of the SWP and CVP, including Project compliance with the water rights and water quality decisions and orders of the State Water Resources Control Board, are *non-discretionary* as that term is utilized in

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

*Home Builders. See Gutierrez* Decision, Conclusions of Law ¶ 9. By failing to distinguish the discretionary aspects of SWP and CVP operations from the non-discretionary aspects of such operations, Defendants and the BiOp improperly attempt to consult on the entirety of Project operations including those aspects of Project operations that are non-discretionary and not subject to the consultation requirements of the ESA.  Thus, the BiOp fails to isolate the incremental effects of the Project, i.e., those effects that would be added to the environmental baseline by the proposed discretionary CVP and SWP operations, from the effects resulting from the environmental baseline.

ii.   The BiOp employs an environmental baseline that is not a "snapshot at a specified point in time" and fails to evaluate the "past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early Section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process."  50 C.F.R. § 402.02.  Instead, the BiOp improperly evaluates in its "Effects Analysis" – and inappropriately attributes to the SWP and CVP – past and present impacts on the Subject Species of Federal, State or private actions and other human activities in the action area that should have properly been included in the environmental baseline.  Prior Project operations that have already undergone formal Section 7 consultation should have been included in the environmental baseline in the BiOp.  Similarly, and by way of example, on-going human activities in the action area that have taken place for decades and involve the discharge of toxic

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

materials or the diversion of water by means of thousands of private unscreened in-Delta diversions are not treated as part of the environmental baseline, but as effects of the proposed Project. The BiOp further erred by treating the effects of "other stressors," such as invasive plant species and lack of food, as effects of the proposed Project, even though they are not within the scope of indirect effects properly attributed to the proposed operations. As a result, the BiOp inadequately describes the effects on the Subject Species resulting from the environmental baseline.

  iii. The BiOp fails to quantify or otherwise describe in detail the baseline effects on the Subject Species and, as a result, improperly attributes baseline effects to the Project. Even when the Project properly classifies and discusses non-discretionary project operations, past actions and other stressors as baseline conditions, the BiOps fails to quantify the effects of the baseline conditions on the Subject Species. *See, e.g.*, ¶ 49 above. Without a quantitative assessment or detailed description of the baseline effects, i.e. the status of the Subject Species under a "no-project" scenario, the BiOp cannot isolate the incremental harm caused by the Project. *See, e.g.*, BiOp at 59-60 (explaining that the BiOp's attempt to isolate the future effects of the Project from baseline future effects was "not fruitful" and that, as a result, all future operations were presumed to be effects of the Project).

  b. The BiOp fails to undertake analysis or make findings regarding whether the effects of the action "*appreciably*" reduce the likelihood of survival and recovery, thereby causing jeopardy to the Subject Species. While the BiOp provides a list of Project effects, significantly, there is no quantification of the magnitude of *any* of the effects, nor is there analysis or explanation of how and why these unquantified impacts would have

Best Best & Krieger LLP
ATTORNEYS AT LAW
RIVERSIDE

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

the effect of *appreciably* reducing the likelihood of survival and recovery.  Instead, the BiOp's jeopardy determination is based upon a flawed methodology and misconstructions of the jeopardy standard, including the following:

i.     The BiOp incorrectly concludes that, when a species is already in a degraded state under baseline conditions, a proposed action that would cause *any* additional harm would jeopardize the species' continued existence.  By doing so, NMFS reads the word "appreciably" out of title 50, C.F.R. section 402.02.  By way of example, the BiOp concludes that the proposed Project would jeopardize the winter-run Chinook because "the winter-run ESU is currently at a high risk of extinction" and "[w]ith implementation of the proposed action, winter-run will have to cope with additional stressors."  BiOp at 465.

ii.     The BiOp fails to quantify the Project's *population-level* consequences and, instead, assumes without substantiation that the loss of an individual fish or marine mammal would justify a jeopardy determination.  For example, in evaluating Project effects on the killer whale, the BiOp states "it is NMFS' opinion that any action that is likely to hinder the reproductive success or result in serious injury or mortality of a single individual is likely to appreciably reduce the survival of the DPS."  BiOp at 54.  Pursuant to title 50, C.F.R. section 402.02, a jeopardy determination is only proper if the Project appreciably reduces the likelihood of survival and recovery of the *species*.  The BiOp fails to quantify the impact of a single individual injury or loss to the killer whale DPS as whole, or otherwise provide a scientific basis for treating a single loss as an appreciable population-level impact.

- 34 -

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

iii.    The BiOp conflates the requirements of Section 7 of the ESA and title 50, C.F.R. section 402.02 and concludes that a jeopardy determination is justified because "*the [Bureau] has not ensured that the proposed action is not likely to appreciably reduce the likelihood of viability, and therefore the likelihood of both the survival and recovery of the [winter-run Chinook] ESU.*"  BiOp at 465 (emphasis added).  Jeopardy exists where an action "reasonably would be expected . . . to reduce appreciably the likelihood of both the survival and recovery of a listed species."  50 C.F.R. § 402.02.  The BiOp's statement indicates that the Bureau's analysis has not disproved the possibility that the proposed action *might* appreciably reduce the likelihood of survival and recovery; however, the BiOp does not analyze or explain why the Project's unquantified effects "*reasonably would be expected*" to have such an impact.

iv.    The BiOp improperly equates the concepts of "risk of extinction" and "likelihood of viability," developed as criteria for recovery, with the prescribed Section 7 jeopardy standard, "likelihood of both the survival and recovery" of the Subject Species.  BiOp at 68.  This approach is novel, inconsistent with other biological opinions and without legal precedent.  Regarding the salmonid species, the BiOp bases its jeopardy determination on the analysis of four Viable Salmonid Population ("VSP") parameters, population abundance, population growth, spatial structure and diversity.  BiOp at 51-53.  However, VSP parameters were developed as *recovery* criteria for use in *recovery* planning, not *jeopardy* analysis, and do not "assess ESU viability in absolute terms."  Lindley et al. (2007), Exh. E.  This approach is scientifically inappropriate and procedurally improper under the ESA.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

v.      The "recovery" prong of the *jeopardy* analysis is satisfied if the proposed action will not block or thwart all possibility of recovery. *See National Wildlife Federation v. National Marines Fisheries Service*, 524 F.3d 917 (9th Cir. 2007). However, by utilizing the VSP parameters, the BiOp erroneously requires the Project's effects to meet a more stringent long-term recovery goal, i.e., if the risk to recovery under baseline and Project conditions is greater than 5% over 100 years, the BiOp concludes that the recovery prong cannot be met. *See* May 27, 2009 SWC Letter at 4-5, Exh. A; *see also* Lindley et al. (2007), Exh. E. Such a long-term recovery goal is in stark contrast to similar biological opinions that evaluate recovery over a much shorter time period and contrary to the legal standard.

70.     Because of the above-described methodological failures, Defendants failed to undertake the required analysis of the effects of proposed SWP and CVP operations on the Subject Species. As a result, the BiOp had no basis on which to lawfully determine whether proposed Project operations "would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers or distribution of that species." 50 C.F.R. § 402.02. Instead, because of the BiOp's faulty effects analysis and methodology, Defendants grossly overestimate the impacts of proposed Project operations on the Subject Species. In addition, the BiOp misstates and misapplies the standard against which the impacts should be judged. Consequently, the "jeopardy" conclusion reached by Defendants is without adequate support and is therefore arbitrary, capricious, an abuse of discretion, not in accordance with the law, in excess of statutory authority, and without observance of procedure required by law, in violation of Section 7 of the ESA and its implementing regulations and the standards of the APA.

71.     Section 7 of the ESA also requires that if "jeopardy" to a species or adverse modification of critical habitat is found by the Secretary, the Secretary shall suggest reasonable and prudent alternatives that are sufficient to prevent jeopardy. 16 U.S.C. § 1536(b)(3)(A);

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

50 C.F.R. § 402.14(h)(3). In formulating such an RPA, the Service is required to use the best scientific and commercial data available, (16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8)), and to demonstrate that the RPA that is imposed does not jeopardize the listed species or result in the destruction or adverse modification of its critical habitat. *American Rivers v. National Marine Fisheries Service*, 126 F.3d 1118, 1122-1123 & fn.11 (9th Cir. 1997); *Greenpeace v. National Marine Fisheries Service*, 237 F. Supp. 2d 1181, 1185 (W.D. Wash. 2002). Notwithstanding these requirements, Defendants fail to explain how the RPA set forth in the BiOp will serve to remove the Subject Species from the "jeopardy" purportedly caused by SWP and CVP operations. *See, e.g.*, ¶ 56 above. The analysis, reasoning, and conclusions of the BiOp with respect to the RPA imposed, and Defendants' actions described herein, are arbitrary, capricious, an abuse of discretion, not in accordance with the law, in excess of statutory authority, and without observance of procedure required by law, all in violation of Section 7 of the ESA and its implementing regulations and the standards of the APA.

72. Defendants' failure to utilize the legally required methodology in preparing and adopting the BiOp, including the RPA, and in determining whether the proposed federal action will jeopardize the continued existence of the species or destroy or adversely modify critical habitat, violates the ESA and the requirements of the APA. 5 U.S.C. § 553(b), (c). The analysis, reasoning, and conclusions of the BiOp, and Defendants' actions described herein, are arbitrary, capricious, an abuse of discretion, not in accordance with the law, in excess of statutory authority, and without observance of procedure required by law, in violation of Section 7 of the ESA and its implementing regulations and the standards of the APA. Through the above failures, Defendants also unlawfully foreclosed evaluation in the BiOp of any other potential reasonable and prudent alternatives which may have also better met the objectives of the SWP and CVP. *See Southwest Ctr. for Biological Diversity v. Bureau of Reclamation*, 143 F.3d at 523 fn.5.

73. Plaintiff has exhausted any and all administrative remedies required by law and has performed any and all conditions precedent to the filing of this action.

74. Plaintiff's interests have been, are, and will continue to be directly and adversely affected by Defendants' failures and unlawful actions.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

75.     Plaintiff has no plain, speedy or adequate remedy at law and, unless relief is granted as prayed, Plaintiff's interests in SWP water supplies will be adversely affected and irreparably injured by Defendants' unlawful acts.

**FOURTH CLAIM FOR RELIEF**

**Against All Defendants for Violation of the Administrative Procedure Act and the National Environmental Policy Act (42 U.S.C. § 4321 et seq.)**

76.     Plaintiff realleges and incorporates, as if fully set forth herein, each and every allegation contained in paragraphs 1 through 75, inclusive, of this Complaint.

77.     NEPA requires federal agencies to prepare a detailed Environmental Impact Statement ("EIS") for all actions that are (1) federal, (2) "major," and (3) that may have a significant effect on the human environment.  42 U.S.C. § 4332(2)(C); *Nat'l Wildlife Fed. v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995).  Common categories of "major federal actions" include: (1) the "[a]doption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based;" (2) "systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive;" and (3) "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area" including "actions approved by permit or other regulatory decision as well as federal and federally assisted activities."  40 C.F.R. § 1508.18(b)(2), (3), (4).  Defendants' issuance of the BiOp containing directions to impose the RPA constitutes a major federal action that may have a significant effect on the environment.

78.     Defendants are Federal Government agencies or officials that took final agency action within the meaning of the APA by issuing the BiOp.  *See Bennett v. Spear*, 520 U.S. at 178; *Ramsey v. Kantor*, 96 F.3d 434 (9th Cir. 1996); *Westlands Water Dist. v. United States,* 850 F. Supp. 1388, 1422 (E.D. Cal. 1994).

79.     The BiOp was issued and implemented as part of an interconnected set of agency actions, under which Defendants had ultimate control over the requirements set forth in the RPA for the take authorization to be applicable.  *See generally Bennett v. Spear*, 520 U.S. at 169, 170

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

1  (determining that a biological opinion "has a powerful coercive effect on the action agency" and

2  that such opinions have a "virtually determinative effect"); *see also Westlands Water Dist. v.*

3  *United States,* 850 F. Supp. at 1422 (recognizing that the Bureau's options are "narrow" should it

4  decline to follow NMFS's RPAs).

5        80.    Defendants' issuance of the BiOp constitutes a major federal action because,

6  among other reasons:

7        a.    In the "jeopardy" BiOp, the Defendants prescribe an RPA, to be

8  implemented by the Bureau, under which NMFS estimates an average of about 330,000

9  acre-feet of CVP and SWP water would be reserved for uses other than those proposed

10  under OCAP. CVP water is a federal resource. *Westlands Water Dist. v. United States,*

11  850 F. Supp. at 1422. The operation of the SWP is also the subject of the Section 7

12  consultation since, under the terms of the Coordinated Operations Agreement applicable

13  to both the CVP and SWP, project operations are coordinated for purposes of export

14  operations in the Delta. Thus, the issuance of the BiOp constitutes the adoption of an

15  "official documents prepared or approved by a federal agency which guide[s] or

16  prescribe[s] alternative uses of Federal resources, upon which future agency actions will

17  be based." 40 C.F.R. § 1508.18(b)(2); *see also Westlands Water Dist. v. United States,*

18  850 F. Supp. at 1422 (determining that a biological opinion would constitute a major

19  federal action where it resulted in the commitment of 225,000 acre feet of CVP water

20  under the ESA for salmon protection).

21        b.    The BiOp was adopted as part of a series of interconnected agency actions

22  that implement Section 7 of the ESA and ultimately require the use of a NMFS-estimated

23  330,000 acre feet of CVP and SWP water for Subject Critical Habitat. Thus, the adoption

24  of the BiOp and prescription of RPA actions constitute "systematic and connected agency

25  decisions allocating agency resources to implement a specific statutory program." 40

26  C.F.R. § 1508.18(b)(3).

27        c.    The BiOp, RPA and incidental take statement serve to mandate certain

28  management activities to be performed by the CVP and SWP in the Sacramento and San

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

- 39 -

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Joaquin River basins.   Thus, the BiOp effectively approves "management activities located in a defined geographic area."  40 C.F.R. § 1508.18(b)(4).

d.      The BiOp prescribes an RPA that would require the SWP and CVP to operate beyond routine managerial changes.  Federal actions that require the operation of existing projects outside the scope of routine managerial changes are major federal actions.  *See Upper Snake River v. Hodel*, 921 F.2d 232, 235 (9th Cir. 1990); *see also County of Trinity v. Andrus*, 438 F. Supp. 1368, 1388 (N.D. Cal. 1977).  RPA Action IV.2.1 "San Joaquin River Inflow to Export Ratio" requires the CVP and SWP to operate their pumps at rates that will reduce the quantity of water exported by an NMFS-estimated average of 330,000 acre-feet per year "over and above export curtailments associated with the [USFWS BiOp for delta smelt]," constituting a major departure from the ordinary range of routine operations.  BiOp at 580, 641-644.

e.      "[I]f a federal permit is a prerequisite for a project with adverse impact on the environment, issuance of that permit does constitute major federal action."  *Ramsey v. Kantor,* 96 F.3d at 444.  The BiOp is the functional equivalent of a permit because, as a practical matter, the Bureau and DWR would not be permitted to proceed with OCAP operations but for the incidental take statement contained in the BiOp.  *Id.*

81.     Implementation of the BiOp will significantly affect the quality of the human environment for multiple reasons.  Among other significant effects:

a.      The BiOp will result in a substantial loss of water to humans and human activities by reallocating hundreds of thousands of acre-feet of water annually away from reasonable and beneficial uses reliant upon the SWP, including drinking and other potable uses, municipal and industrial uses, and agricultural uses, but contains no discussion whatsoever of the probable direct and indirect environmental and other impacts of such decreased water availability.

b.      The decreased amount of water available to the SWP and CVP will result in a decreased ability to store such water in reservoirs for consumptive uses and otherwise prepare for dry years and emergencies but the BiOp contains no discussion of the probable

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

direct and indirect environmental and other impacts of such decreased water availability.

c.     The BiOp will indirectly, but foreseeably, lead to a variety of effects to the human environment, including, among other impacts:

i.     the fallowing of annual crops and the loss of permanent crops on thousands of acres of highly productive farmland;

ii.    significantly increased groundwater pumping and concomitant declining groundwater levels throughout wide areas of California which will, in turn, lead to a host of significant impacts to the human environment including increased energy consumption and land subsidence with potential loss of recharge capability and damage to levees, roads, water systems, sewer systems, buildings and other improvements; and

iii.   the likelihood of drastically reduced water and food supplies for resident and migratory wildlife, including special status and listed species throughout the service areas of Plaintiff's member agencies.

d.     The loss of SWP water caused by implementation of the BiOp will contribute to public safety hazards due to the compromised ability to ensure adequate flows in the event of wildfire outbreaks, a large seismic event, major Delta levee failure, or other catastrophic occurrence.

e.     The fallowing of agricultural land will lead to soil erosion, wind-borne particles causing air quality impacts, and public health impacts.

f.     The loss of SWP water caused by implementation of the BiOp will compromise water quality and quantity throughout the SWP service area, potentially leading to salt water intrusion into coastal groundwater basins and elsewhere, as well as the loss of high quality SWP water used for blending with lower quality water for water recycling projects to meet water quality standards for the recharge of water to existing groundwater basins.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

82.    Project impacts, including but not limited to those discussed above, will be exacerbated due to the cumulative impact of the ongoing drought and previously imposed constraints on Project operations.

83.    Defendants violated NEPA by undertaking no analysis of the BiOp's environmental effects, and by issuing no environmental document.

84.    Plaintiff has been adversely affected and aggrieved by Defendants' failure to comply with NEPA.  Among other adverse effects, Defendants' issuance of the BiOp without complying with NEPA will result in:

a.    The severe curtailment of water exports to Plaintiff's member agencies and their more than 25 million customers;

b.    Damage to the quality of water supplies delivered to Plaintiff's member agencies;

c.    Diminishment of Plaintiff's ability to recycle water or utilize recycled water;

d.    Decreased groundwater recharge;

e.    Lowered groundwater levels and concomitant increased energy use to pump groundwater; and

f.    A significantly increased potential for land subsidence resulting in an enhanced potential for soil compaction and loss of recharge capability as well as damaged levees, bridges, aqueducts, buildings, wells, and other improvements relied upon or operated by Plaintiff's member agencies.

85.    Implementation of the BiOp will also result in significant impacts to other protected species because water currently used for the benefit of those other species will be reallocated to maintain flows purportedly for the benefit of salmonids and green sturgeon.

86.    The State Contractors have exhausted their administrative remedies regarding Defendants' failure to comply with NEPA by submitting a comment letter to Defendants on May 26, 2009, prior to their issuance of the BiOp.  A true and correct copy of the State Contractors' comment letter is attached hereto as Exhibit "I."

87.     Defendants' failure to prepare an adequate environmental document or undertake any environmental review at any time preceding the decision to issue the BiOp is arbitrary, capricious and an abuse of discretion and violates the Administrative Procedure Act.  5 U.S.C. § 706(2)(A).  Unless Defendants' conduct is reviewed pursuant to 5 U.S.C. § 701 et seq. and restrained and enjoined, Defendants will continue to engage in a major federal action significantly affecting the quality of the human environment without having considered the environmental impacts of their action, in violation of NEPA and the APA.

88.     Plaintiff has exhausted any and all administrative remedies required by law and has performed any and all conditions precedent to the filing of this action.

89.     Plaintiff's interests have been, are, and will continue to be directly and adversely affected by Defendants' failures and unlawful actions.

90.     Plaintiff has no plain, speedy or adequate remedy at law and, unless relief is granted as prayed, Plaintiff's interests in SWP water supplies will be adversely affected and irreparably injured by Defendants' unlawful acts.

## FIFTH CLAIM FOR RELIEF

**Against All Defendants for Violation of Section 7 of the Endangered Species Act by Requiring a Reasonable and Prudent Alternative that Cannot be Implemented Consistently with the Scope of DWR's Legal Authority and Jurisdiction**

91.     Plaintiff realleges and incorporates, as if fully set forth herein, each and every allegation contained in paragraphs 1 through 90, inclusive, of this Complaint.

92.     Section 7 of the ESA (16 U.S.C. § 1536) and title 50, section 402.02 of the Code of Federal Regulations require Defendants to ensure that any RPA they adopt is consistent with the scope of the action agency's legal authority and jurisdiction.  Section 7 of the ESA and title 50, section 402.03 of the Code of Federal Regulations also provide that the consultation requirements of the ESA apply only to actions in which there is discretionary involvement or control, and do not extend to requirements that would compel agency action inconsistent with a non-discretionary statutory mandate.  *See National Ass'n of Home Builders v. Defenders of Wildlife*, 127 S.Ct. at 2533-2535.  It is also the policy of Congress that "Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

conservation of endangered species." 16 U.S.C. § 1531(c)(2). Further, Section 8 of the Reclamation Act of 1902 (43 U.S.C. § 383) requires the Bureau to operate the CVP in accordance with state water rights law, including proscriptions imposed on the CVP by the State Water Resources Control Board. *See California v. United States*, 438 U.S. 645, 675; *National Ass'n of Home Builders*, 127 S.Ct. at 2535 (stating that *California v. United States* holds that "a statutory requirement that federal operating agencies conform to state water usage rules applied only to the extent that it was not 'inconsistent with other congressional directives'").

93.     Under California law, DWR and the Bureau have a non-discretionary duty to operate the SWP and the CVP in conformity with the requirements of Article X, Section 2 of the California Constitution which prohibits the unreasonable use or waste of water. More specifically, Article X, Section 2 of the California Constitution provides:

> It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water.

*See also National Audubon Society v. Superior Court*, 33 Cal. 3d 419, 443 (1983).

94.     The California Supreme Court has explained that: "[W]hat is a reasonable use of water depends on the circumstances of each case, such an inquiry cannot be resolved *in vacuo* isolated from statewide considerations of transcendent importance. Paramount among these we see the ever increasing need for the conservation of water in this state, an inescapable reality of life quite apart from its express recognition in [Article X, § 2]." *Joslin v. Marin Municipal Water Dist.*, 67 Cal.2d 132, 140 (1967).

95.     Defendants violated Section 7 of the ESA and Title 50, sections 402.02 and 402.03 of the Code of Federal Regulations by imposing an RPA upon DWR and the Bureau that violates

1  the non-discretionary prohibition against the unreasonable use and waste of water set forth in

2  Article X, Section 2 of the California Constitution and is thus inconsistent with the scope of the

3  action agencies' legal authority and jurisdiction.

4         96.     Implementation of the BiOp threatens to result in the unreasonable use, and waste,

5  of hundreds of thousands, if not millions, of acre feet of water to which the SWP and CVP

6  already have an entitlement.  In times of severe drought, such as that which currently exists in

7  California, water will be lost to the projects and the myriad public uses of water they support.

8  Instead, this water will be re-allocated for the purported benefit of the Subject Species and will be

9  released downstream of the Delta to the Pacific Ocean, from where it cannot be recovered.

10         97.     The RPA set forth in the BiOp requires such a re-allocation of water without any

11  demonstration that the hundreds of thousands of acre feet of water that will be taken from human

12  consumptive purposes pursuant to its terms will provide any meaningful, population-level benefit

13  to the salmonid, green sturgeon or killer whale species.

14         98.     Defendants' issuance of a BiOp with an RPA that compels the operators of the

15  SWP and the CVP to undertake actions that result in the release of hundreds of thousands of acre

16  feet of water to the Pacific Ocean without any showing that doing so will result in any measurable

17  benefit to the salmonids, green sturgeon or killer whale is inconsistent with the non-discretionary

18  mandate of Article X, Section 2 of the California Constitution regarding the waste or

19  unreasonable use of water and thus is outside the scope of the legal authority and jurisdiction of

20  DWR and Reclamation and is arbitrary, capricious, and an abuse of discretion, and violates

21  Section 7 of the ESA, the ESA implementing regulations adopted by Defendants, and the APA

22  (5 U.S.C. § 706(2)(A)).

23         99.     Defendants' failure to issue a BiOp with an RPA that complies with the waste and

24  unreasonable use requirements of the California Constitution is arbitrary, capricious and an abuse

25  of discretion and violates the APA.  5 U.S.C. § 706(2)(A).  Unless Defendants' conduct is

26  reviewed pursuant to 5 U.S.C. § 701 et seq. and restrained and enjoined, Defendants will continue

27  to require the implementation of an RPA that violates Article X, Section 2 of the California

28  Constitution, Section 7(a)(2) of the ESA and Title 50, sections 402.02 and 402.03 of the Code of

BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

        - 45 -       COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1 Federal Regulations.

2

3                    **PRAYER**

4        WHEREFORE, Plaintiff prays for relief against Defendants as follows:

5

6        A.  That the Court invalidate the BiOp and find and declare that its issuance was

7            arbitrary and capricious, an abuse of discretion, and not in accordance with the

8            law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2);

9

10       B.  That the Court order the Secretary to comply with the law forthwith by

11           withdrawing its BiOp, but not vacating it, and reinitiating consultation on the

12           Project, and lawfully describing the effects of, *inter alia*, other Delta water

13           diversions and other stressors of the Subject Species in the resulting BiOp;

14

15       C.  That the Court issue temporary, preliminary, and permanent injunctive relief

16           enjoining Defendants from enforcing the Reasonable and Prudent Alternative

17           adopted as part of the BiOp and from taking any action against the State

18           Contractors or the SWP in reliance on the BiOp;

19

20       D.  That the Court order Defendants to perform adequate and complete environmental

21           review of the BiOp pursuant to the provisions of the National Environmental

22           Policy Act;

23

24       E.  That the Court declare the Reasonable and Prudent Alternative of the BiOp was

25           adopted in violation of the requirements of Section 7 of the Endangered Species

26           Act and title 50 of the Code of Federal Regulations;

27

28

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

F.   That the Court retain jurisdiction over this matter until such time as Defendants have fully complied with the Court's Orders;

G.   That the Court award Plaintiff its costs of litigation, including reasonable attorneys' fees and expert witness fees; and

H.   That the Court grant Plaintiff such further and additional relief as the Court may deem just and proper.

Dated:  August 6, 2009                          BEST BEST & KRIEGER LLP


By:    /s/ Gregory K. Wilkinson
      GREGORY K. WILKINSON
      STEVE M. ANDERSON
      JILL N. WILLIS
      KIRA L. JOHNSON
      Attorneys for Plaintiff
      STATE WATER CONTRACTORS

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
RIVERSIDE

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF